**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 17-534 (KM) |
| v. | |
| **RAYMOND PETWAY,** | **OPINION & ORDER** |
| **Defendant.** | |

**KEVIN MCNULTY, U.S.D.J.:**

In a superseding indictment, Raymond Petway was charged with being a felon in possession of a firearm (18 U.S.C. § 922(g)); possession with intent to distribute heroin (21 U.S.C. § 841(a)); and carrying a handgun during, in relation to, and in furtherance of that heroin offense (18 U.S.C. § 924(c)(1)(A)(i)). After a four-day trial, a jury convicted Mr. Petway on all three counts. This matter now comes before the Court on Petway's post-trial motion for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), or in the alternative for a new trial, pursuant to Fed. R. Crim. P. 33. (DE 81, 82, 88) I have considered the proffered grounds separately and in combination.

## I.    Legal Standards Under Rules 29 and 33

Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson,* 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle,* 63 F.3d 1239, 1243 (3d Cir. 1995)). In reviewing a motion for acquittal, the court "must be ever vigilant ... not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). The evidence is to be viewed in the light most favorable to the prosecution. *United States v. Hart,* 273 F.3d 363, 371 (3d Cir. 2001). The government receives "the

1

benefit of inferences that may be drawn from the evidence and the evidence may be considered probative even if it is circumstantial." *United States v. Pecora*, 738 F.3d 614, 618 (3d Cir. 1986). Credibility conflicts, too, are to be resolved in the government's favor. *United States v. Scanzello*, 822 F.2d 18, 21 (3d Cir. 1987). Having applied those principles of interpretation, the court must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). *Accord United States v. Fattah*, 902 F.3d 197, 268 (3d Cir. 2018) (reviewing court, applying same standard as district court, must affirm "unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt"); *United States v. Caraballo-Rodriguez,* 726 F.3d 418, 430-31 (3d Cir. 2013) (en banc) (reaffirming *Jackson* standard and reversing a line of drug conspiracy cases to the extent they undermined it); *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987).

The standard under Rule 33 is more general; a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. When a defendant seeks a new trial claiming that the verdict was against the weight of the evidence, the court's review is less restricted than it is under Rule 29. "However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Silveus,* 542 F.3d 993, 1004-05 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)).

A Rule 33 motion may also be based on an alleged error or combination of errors at trial. Borrowing the appellate concept of harmless error, district courts have held that a new trial will be ordered when it is "reasonably possible

that such error, or combination of errors, substantially influenced the jury's decision." *United States v. Crim,* 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008) (citing *U.S. v. Copple,* 24 F.3d 535, 547 n. 17 (3d Cir. 1994)), *aff'd,* 451 F. App'x 196 (3d Cir. 2011); *accord United States v. Bryant,* Crim. No. 07-267, 2009 WL 1559796 at *6 (D.N.J. May 28, 2009). In doing so, however, the court must consider the alleged errors in the context of the strength of the evidence of guilt, the scope of the objectionable conduct in relation to the entire proceeding, and the ameliorative effect of any curative instruction. *See United States v. Gambone,* 314 F.3d 163, 179 (3d Cir. 2003) (citing *United States v. Zehrbach,* 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc); *United States v. Helbling,* 209 F.3d 226, 241 (3d Cir. 2000)).

## II.    Rule 29: Evidence at Trial

I will only briefly summarize the evidence at trial, which was quite strong.

On the morning of September 21, 2017, Officer (now Detective) Jeison Martinez of the Jersey City Police Department was in an unmarked car, surveilling the area of Martin Luther King Drive and Woodlawn Avenue. He saw Petway and others sell glassine envelopes to customers. Post-arrest, the police recovered glassine envelopes of heroin from Petway, which bore markings similar to one recovered from one of the customers, as well as some cash. From the area of Petway's ankle, tucked in his shoe, a gun was recovered.

Detective Martinez testified to his observation of Petway's drug dealing on surveillance. Detective Giovanni Bove testified to his arrest of one of Petway's customers and recovery of two glassine envelopes of heroin from that customer. Detective Joemy Fernandez testified that he had arrested Petway, from whom he recovered cash and five glassine envelopes of heroin, identical in size and packaging to the two recovered from Petway's customer. Fernandez also testified that, after Petway was transported to the police station, he recovered the loaded gun from Petway's shoe and ankle area. Detective Kevin Lowry testified that he logged the recovered items and placed them in evidence.

Also in evidence was surveillance video from the deli at the corner of Martin Luther King Drive and Woodlawn Avenue. It showed Petway loitering in the deli for over an hour without making a purchase, and showed Petway and his co-conspirators repeatedly counting small amounts of cash. One apparent interaction with a buyer (who was not found or arrested) was captured on video.

Mr. Petway did not testify. The bulk of the defense strategy was devoted to an attempt to demonstrate that he could not physically have concealed a gun—which was not discovered until he was processed at the police station—in his shoe and ankle area. Over the government's objection regarding the chain of custody, I admitted in evidence what purported to be the trousers and shoes that Mr. Petway had worn on the day of his arrest. (Tr. 869; Def. Exh. 200, 201, 202) The defense sought to have an in-court demonstration by Mr. Petway of what it *would* have looked like if he *had* been carrying the gun, which he denied doing. I did not permit that in-court demonstration by Mr. Petway himself, or permit him to recall Det. Fernandez, who had fully testified and been cross-examined on the subject, for the purpose of having Fernandez do an in-court demonstration. I did, however, grant the defense full latitude to display the gun (with safety locks and the firing pin removed), as well as the trousers (which were made of a stretchy material, gathered at the ankle with a zipper). I also permitted defense counsel, in summation, to don the shoe and place the gun in the shoe, as a form of demonstrative argument.

This evidence easily meets the Rule 29 threshold; the motion for a judgment of acquittal is denied.

## III.   Rule 33: Motion for New Trial

The defendant's motion is really focused on three claims of error, and is therefore best analyzed under the more flexible Rule 33 standard for grant of a new trial.

### A. Pretrial motion *in limine* regarding impeachment by prior convictions

Mr. Petway has seven prior felony convictions. The government proffered before trial that it would seek to impeach him, should he testify, with three:

**January 8, 2009**

Theft in violation of N.J.S.A. § 2C:35-7, a third-degree felony. Mr. Petway was sentenced to 364 days' imprisonment followed by 4 years of probation. On August 27, 2009, his probation was revoked, and he was resentenced to 4 years' imprisonment.

**July 8, 2016 (two convictions)**

(a) Distribution of a CDS within 1,000 feet of school property in violation of N.J. Stat. Ann. § 2C:35-7, a third-degree felony (arrest date April 10, 2015).

(b) Distribution of a CDS within 1,000 feet of school property in violation of N.J. Stat. Ann. § 2C:35-7, a third-degree felony (arrest date October 9, 2014).

For these two CDS offenses, Mr. Petway was given concurrent sentences of 5 years' probation.

In a written decision, I analyzed the relevant factors under Fed. R. Evid. 609(a)(1)(B) and balanced the probativeness of the convictions against the potential prejudice.[1] (*See* DE 60 ("In Limine Opinion").) I ruled that the theft offense, a crime of dishonesty not similar to the current offenses, could be used to impeach any testimony by Petway. I ruled that the CDS offenses, because of their similarity to the current offense, could be used, but only on condition that their nature would not be revealed to the jury.[2]

---

[1]   As noted in my Opinion, for an eligible prior felony conviction within the ten-year lookback period, the Court must also consider four factors: "(1) the kind of crime involved; (2) when the conviction occurred; (3) the importance of the defendant's testimony to the case; and (4) the importance of the credibility of the defendant." *United States v. Caldwell*, 760 F.3d 267, 286 (3d Cir. 2014) (citing *Gov't of V.I. v. Bedford*, 671 F.2d 758, 761 n.4 (3d Cir. 1982)).

[2]   One of the charges being tried, that of being a felon in possession of a firearm, would require a jury finding that the defendant had a prior felony conviction. The Court bifurcated the trial so that the jury heard about the prior felony, via a sanitized

I will not here rehash the analysis of the In Limine Opinion, which is incorporated herein by reference. While the defendant seeks to have the Court reweigh the factors and reach a different conclusion, he points to no legal or factual error, and I see none.[3] The *in limine* ruling was within the discretion of the Court and did not constitute error. Therefore, whether considered alone or in combination with the defendant's other claims, it fails to rise to the level of requiring Rule 29 or Rule 33 relief.

### B. **Ineffective Assistance of Counsel**

Defense counsel, Christopher D. Adams, Esq., on his client's instructions, has asserted a claim that his assistance was ineffective. Having presided at trial, I observe that Mr. Adams defended the case ably, zealously, and conscientiously. The ineffectiveness claim here, however, is more specific.

Mr. Petway asserts that counsel did not properly advise him of his rights before he elected not to testify. In the usual case, "the proper avenue for pursuing such claims is through a collateral proceeding in which the factual basis for the claim may be developed." *United States v. Theodoropoulos*, 866 F.2d 587, 598 (3d Cir. 1989) (citations omitted). Where the basis for such a claim is patent on the face of the record, it might justify immediate action by the court in the form of a grant of a motion for a new trial, to avoid the waste of trial and appellate court resources. This, however, is not such a case.

---

stipulation, only after they had deliberated on all other issues. (*See* Tr. 1068 et seq.) That procedure exceeded the requirements of *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644 (1997).

[3]     I note that the defendant's election not to testify would ordinarily bar appellate review. *See Luce v. United States*, 469 U.S. 38, 43, 105 S. Ct. 460 (1984) ("to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify."); *United States v. Janqdhari*, 755 F. App'x 127, 130 (3d Cir. 2018) (citing reported cases). A defendant who wishes to preserve for appeal an objection to such a pretrial in limine ruling must in fact testify and suffer the actual, not hypothetical, prejudice of which he complains, which then can be assessed in the context of the trial record. Nevertheless, I will assume without deciding that, under the flexible Rule 33 standard, a court retains the discretion to consider whether it erred in this respect, and, if so, whether fairness requires a new trial.

6

The defense stated its intention to, and did, introduce the testimony of one witness, a corrections intake officer, for the purpose of introducing the clothing and shoes Mr. Petway wore at the time of his arrest. (Tr. 852:23–882:11) It appearing that the defense was about to rest, counsel for both sides raised the issue of defendant's decision whether to testify:

> MR. ADAMS: . . . I may need another moment with Mr. Petway, given what is his right against self-incrimination and whether or not he desires to testify.
>
> THE COURT: Okay.
>
> (Discussion off the record between the defendant and his counsel.)
>
> MR. ADAMS: Your Honor?
>
> THE COURT: Yes.
>
> MR. ADAMS: At this point in time I think it's necessary for the Court to voir dire Mr. Petway. And I wanted to make it clear on the record that I have spent a considerable amount of time, without getting [into] the attorney/client privilege . . . consulting with [Mr. Petway] and describing to him the pros and cons of whether or not he, as a defendant in this, will testify, especially in light of the Court's 404(b)[4] and what would -- how the door would be open on cross-examination.
>
> I spent no less than an hour last evening on the phone with him and more time today advising him that it is my ardent advice that he not testify because of the collateral consequences.
>
> He is -- we have had this conversation a number of times, not just last night and today, but many times moving up to today. And my advice has never changed. I have repeatedly advised him that it is against the advice of counsel that he testify in his case.
>
> THE COURT: Okay.
>
> MR. ADAMS: With that, Your Honor, I would ask the Court to voir dire Mr. Petway. . . . .

---

[4]      Actually Fed. R. Evid. 609(a), inasmuch as the prior convictions were proffered for purposes of impeachment, not as substantive evidence.

7

(Tr. 887:16-888:21).

In this situation, the court is not required to address the defendant directly, although it is often advisable to do so. In questioning the defendant, the court must be sensitive to any implication that it is rendering legal advice, intruding into the attorney-client relationship, or suggesting which option the defendant should choose. *See United States v. Pennycooke*, 65 F.3d 9 (3d Cir. 1995). I then conducted a voir dire in which I ensured that Mr. Petway understood he had both the right to testify and the right not to testify, that he knew the decision was his alone, and that he had had sufficient opportunity to discuss that important decision with his attorney. *See id.*

> THE COURT: No need to stand up, sir, but I am going to address you directly.
>
> Mr. Petway, the first thing to understand is you've got two rights here, and they're mirror images of each other. You have a right to testify, and you have an absolute right not to testify -- both very important rights. But what that means is there's a choice for you to make. Okay?
>
> THE DEFENDANT: Okay.
>
> THE COURT: Here's what I want to know. Have you consulted with your attorney and have you had enough time to consult with your attorney, I should say, about whether to testify?
>
> THE DEFENDANT: Yes, Your Honor, I did.
>
> THE COURT: And after consulting with your attorney, have you made a decision whether to testify.
>
> THE DEFENDANT: Yes, I did, Your Honor.
>
> THE COURT: And what's your decision?
>
> THE DEFENDANT: I choose not to testify, Your Honor.
>
> THE COURT: Now, the important thing to understand is that you have an absolute right not to testify. You have an absolute right to testify. And if you do not testify, the jury will be instructed that they can't hold that against you. That is, of course, an important safeguard for you.

8

So be aware that in deciding not to testify, that's where we'll be. They will be told that's your right and you have an absolute right.

Do you understand that?

THE DEFENDANT: Yes I do, Your Honor.

THE COURT: Anything further, Counsel?

MS. MALEK: Nothing from the government, Your Honor.

THE COURT: Okay. Well, I should also say, I mentioned you should make that decision in consultation with your counsel; but it is important for you to know that in the end, this is a fundamental decision and it's your decision.

You understand that, right?

THE DEFENDANT: Yes, Your Honor. I do.

(Tr. 904:23-906:8).

It appears from the face of the record, then, that Mr. Petway was advised of his personal right to decide whether to testify or to remain silent, and acknowledged that he had had a full opportunity to discuss his decision with counsel. This aspect of the motion is therefore denied on the face of the record, albeit without prejudice to further development of the record, if appropriate, in a post-judgment motion pursuant to 28 U.S.C. § 2255.

### C. Recall of Det. Fernandez

On his defense case, Mr. Petway sought to recall Det. Fernandez, a prosecution witness whom he had already thoroughly cross-examined, for the purpose of having Fernandez perform an in-court demonstration of how the gun would fit in the sneaker and the area of his ankle. I denied that application, but permitted defense counsel to perform such a demonstration on summation.

### 1. Relevant Portions of the Record

Mr. Petway's defense was essentially that he never possessed the gun, which was not discovered until after he was taken to the police station for

9

booking.[5] Because Petway elected not to testify, he had to pursue this factual defense by other means. His strategy was to attempt to establish that it was unlikely or impossible that he could have concealed the gun by tucking it in his shoe, in the ankle area beneath his trouser leg.[6] That is the context for the testimony of Sgt. Fernandez on the government's case, and the defense's later request to recall Fernandez so that he could physically insert the gun in the shoe for the jury's benefit.

Sgt. Fernandez testified on direct examination that, to his extreme chagrin, he had not detected the gun at the time of the initial pat-down and

---

[5]   The gun charges were the most serious of the counts of the Indictment, and the defense focused on them. *See* Tr. 940:21–24 ("And I told you at the beginning of this case two things that I hope stuck out with you, is that this case is about the gun and the gun alone, and that the drugs were a distraction.") (defense summation).

[6]   The defense proposed that Mr. Petway himself demonstrate to the jury the placement of the gun in his shoe, a proposal the court rejected in a discretionary Rule 403 ruling that is not challenged here. *See generally United States v. Ortiz-Martinez,* 1 F.3d 662, 669 (8th Cir. 1993) ("the admissibility of experimental evidence is within the discretion of the trial court"). (The argument and the court's ruling regarding an in-court demonstration by the defendant himself may be found at Tr. 889:18–900:25.)

The probative value of a demonstration by the defendant himself was outweighed by the potential for prejudice and confusion of the issues. Essentially, Mr. Petway wished, not to recreate a past event, but to perform an in-court experiment to demonstrate what he contended had *not* occurred. The government made the point that there was no reliable way to recreate the conditions, physically or as to visibility, that applied on the street corner. I was also quite concerned about a criminal defendant's obvious incentive to malinger, or the practicalities of reproducing the manner in which, for example, he walked at the time of the arrest. *See Gov't of Virgin Islands v. Lanclos,* 477 F.2d 603, 607 (3d Cir. 1973) ("The purpose of this proposed experiment was to show to the jury that the defendant could not reach the area of his wounds with his hands while handcuffed. The trial judge refused to allow the demonstration on the ground that there would be no way to determine objectively whether or not the defendant was making a good faith effort to reach as far back as he could. The trial judge has considerable discretion in deciding whether or not to permit an experiment in the presence of the jury, and we find no abuse of discretion here.") I also found it extremely inadvisable to create the threatening and potentially disruptive prospect of a gun in the hands of a criminal defendant, mere feet from the jury and spectators. And finally I believed, and found, that the jury could readily judge for themselves the feasibility of carrying the gun with the barrel inserted in the shoe; they could inspect the gun and the sweatpants. And, as described herein, I permitted an alternative demonstration by defense counsel, with appropriate cautions to the jury.

arrest.[7] It was only during processing at the police station, when Mr. Petway was removing his shoes, that the gun became apparent:

> A. At some point I'm conducting my secondary search, my full search, and I recovered drugs from the back of his waistband. After I recovered the drugs, I don't remember exactly where I placed them. I probably placed them on the table behind me. Then I asked him to kick off his sneaker, and I observed the top part of a handgun. I saw a black object sticking out of his ankle area as he's kicking off his sneaker.
>
> Q. Did he say anything to you at that point?
>
> A. Well, I asked him what that was and -- I don't remember, I can't quote him exactly, but he said something like, I'm not even gonna go down there. Like, I'm not even gonna touch it. And at that point I went down and retrieved it.
>
> Q. And so he said something in sum and substance that let you know that he had a weapon in his shoe?
>
> A. Correct. He didn't want to touch whatever it was.

(Tr. 642:20–643:9)

Fernandez, then, did not see the gun until Petway was kicking off his sneaker and his foot was already partially out of the shoe:

> Q [AUSA Malek]. Once you asked him to remove his shoe and he let you know, in sum and substance, that he had a gun, did he then proceed to take his shoe off?
>
> A. At that point, when he was kicking his sneaker off, I retrieved the gun at that point.

---

[7]    Det. Fernandez put it more colorfully:

> Q. Do you recall your state of mind when you learned that he had the weapon on him?
>
> A. I mean, excuse my language, but I remember saying like, Oh, shit. remember I was kind of -- I was pretty shaken up because it's like at that point I kind of put everyone in danger. I missed the gun. And also, I already knew I was going to get in trouble for it. That's what I thought. So it was kind of -- kind of surprised. I had an "Oh, shit" moment.

(Tr. 646:15–19)

Q. He was kicking his sneaker off?

A. Yeah.

Q. So when you saw the gun sticking out of the shoe, his foot was out of the shoe?

A. It was partially out of his shoe, yes.

(Tr. 645:15–24)

Fernandez did not see the gun, then, as it was positioned *before* Petway was partway through the process of kicking off his sneaker. Nor, even at that point, did Fernandez have any precise recollection of the position of the gun:

Q. Do you recall how much of his foot was still –

A. No, not exactly.

Q. But it wasn't fully inside?

A. No.

Q. And do you recall what part of the gun you saw?

A. Not exactly. I would say probably the handle is what I believe I saw.

Q. Do you recall how much of the gun was still inside the shoe at that point?

A. I don't. I know at this point the sneaker was partially off, so I don't really recall.

(Tr. 645:24–625:10)

The defense had a full opportunity to cross-examine Fernandez on the subject of the recovery of the gun from the area of the defendant's ankle:

Q [MR. ADAMS]. What side -- what shoe did you recover the gun from?

A. The right shoe.

Q. Right shoe.

Inside or outside?

A. I would say the outside.

Q. The outside. Out here?

12

THE COURT: I'm sorry. Just to be clear, you don't mean inside or outside the shoe, you mean the outer --

MR. ADAMS: Yes, let me clarify.

BY MR. ADAMS:

Q. I meant the inside of his leg --

A. The outer part.

Q. -- or the outside of his leg.

A. Outer part.

Q. The outer part, which I'm pointing to here on the right side of my foot?

A. Correct.

MS. MALEK: Objection, Your Honor. I think that mischaracterizes the prior testimony. I believe Sergeant testified that when he saw the gun, the shoe -- the foot was almost out of the shoe, so --

THE COURT: The question now is just which side of the ankle it was on. That's all we're talking about now, and he asked the question, he gets an answer. If it is or is not inconsistent with a previous answer, well, so be it.

BY MR. ADAMS:

Q. The right side?

A. I would say, yeah. Maybe not necessarily all the way out like that, but generally on the right side of it, yeah.

Q. Okay. I had it down. Was the gun -- I'm going to do it this way so I'm not pointing the gun towards the jury. I want them to be able to see.

So when I had it like this, do you remember if it was in a downward fashion like that --

A. I don't recall.

Q. -- or was it an upward fashion like that with the magazine pointed upward?

A. I don't recall exactly how it was.

13

(Tr. 681:6–682:18)

Overall, it is quite clear that defense counsel elicited the full extent of Fernandez's knowledge and recall, questioning him as to the orientation of the gun. Defense counsel was as specific as possible about the location, within the limits of Fernandez's knowledge and recall. During his examination, counsel used the gun (with safety lock) as a prop to demonstrate visually on his own leg what Fernandez meant to describe.

Later, during the defense case, the defense sought to recall Sgt. Fernandez to the stand for a specific, limited purpose: so that Fernandez could physically demonstrate the insertion of the gun into Mr. Petway's shoe.

> MR. ADAMS: One, it's the defense's desire to re-call Detective Fernandez and ask him to insert Government 101 into Defense Exhibit 200, the sneaker --
>
> THE COURT: The gun in the shoe.
>
> MR. ADAMS: -- the gun in the shoe in the manner in which he recalls seeing it.
>
> That is Mr. Petway's request.
>
> THE COURT: Listen, I am not going to call the detective to do that. I'll let you do it, though, with the understanding, of course, that the gun is -- has the trigger lock and that business on it and the magazine sticking out.[8]
>
> I won't re-call a witness at this time for that purpose. It doesn't seem -- just doing a 403 balancing, I don't think it adds to [sic] anything that you couldn't accomplish just by doing that yourself.
>
> MR. ADAMS: So if I understand the Court's ruling, the Court would allow me to demonstrate whether or not that gun will fit into the shoe.
>
> THE COURT: I will permit you to do that.

---

[8]     That limitation became obsolete. As noted, the government agents later agreed to disable the gun by removing the firing pin and also to remove the triggerlock and protruding slide and magazine, so the gun would have the same appearance and external dimensions that it had at the time of the arrest. (*See* Tr. 909:24–910:4) At that time, I inspected the gun to confirm that this was so.

14

(Tr. 884:12–885:5)

> THE COURT: [O]n the recalling of Fernandez, I should just give a little more detail on what the balancing was.

> That is, I was balancing the incremental benefit of having Fernandez demonstrate the gun in the shoe. You thoroughly examined him and held up the gun, and he described the orientation of the gun and how it was and so on.

> There's been ample testimony on it. If there hadn't been that, the balance might be different. But what I was saying is that just having him demonstrate, as opposed to having someone else demonstrate it, did not have the incremental value that would satisfy the 403 balance. That's really what I was getting at.

(Tr. 888:22–889:9)

> MR. ADAMS: As I understood the Court's order, Your Honor, I had first requested -- not first. I had requested that Mr. Petway put his shoes on, have the gun demonstrated in there. I understand the Court denied that, but instead would allow me --

> THE COURT: Yes.

> MR. ADAMS: -- to put my foot in the shoe --

> THE COURT: I just don't -- oh, you want to put your foot in the shoe? I didn't know that's what you were doing. Okay.

> MR. ADAMS: My request was to actually put my foot in the shoe and then try to put the gun in the shoe --

> MS. MALEK: Talk about not substantially similar circumstances, Your Honor --

> THE COURT: Yes, but you know what? That's a matter for argument. I am going to let you hold up the shoe, hold up the gun, and do what you want with it. You will have substantial argument that this is not science and you'll make that argument. But I'll let you do it.

> Also, I did clear with [the agents and US Marshals], Mr. Adams, the idea that you personally would be permitted to handle --

> MR. ADAMS: I know there was some resistance.

15

>THE COURT: There was, but I think I got it out of the way -- that
>you will be permitted to handle the gun yourself, albeit with the
>agent standing next to you. And the thing will be inoperable by the
>time you've got it, so I think we're all right.

(Tr. 903:17–904:18)[9]

I gave the defense latitude to make its case. First, despite some weakness in the chain of custody, I admitted in evidence the sweatpants and athletic shoes that the defendant was allegedly wearing when he was arrested. I eventually prevailed upon the US Marshals and the ATF to remove the safety lock on the gun and reposition the slide (after removal of the firing pin), so that its dimensions and appearance at the time of arrest would be immediately apparent to the jury. I granted leave for the jury to inspect both items so that the jurors could make their own judgment. I inspected them closely myself. (Tr. 899:6) The pants, as counsel acknowledged in summations, were made of a stretchy material and were gathered, with a zipper, at the ankle. (Tr. 898:22) The shoes, large high top athletic shoes extending above the ankle, were said by counsel for both sides to be size 13. (*See* Tr. 898:3, 977:9, 1000:10) On inspection, I commented that "I'm not seeing kind of a live impossibility argument here from my view of the size of the gun and the shoe." (Tr. 899:22–25) As I noted, however, the issue was ultimately one for the jury, based on the testimony and physical evidence. (Tr. 899:7–11) ("I have closely inspected this gun and this shoe. Having done so, I believe the jury will have what it needs to make its determination by having the gun and the shoe and being able to move them, manipulate them, see how much space is left, that sort of thing.")[10] Thus I found after inspecting the items that the issue of whether the gun could

---

[9]     Defense counsel also agreed that it would be appropriate to perform the demonstration during closing argument, as opposed to during the defense case. (Tr. 907:9–10)

[10]     There followed a lengthy negotiation, in which the Court insisted on the restoration of the gun, suitably disabled, to its original dimensions and appearance. (Tr. 899–903).

physically have been carried in the manner alleged was one within the ken of a lay jury, even without a demonstration.

And there was a demonstration. Defense counsel displayed the gun and the shoes to the jury in summation. In addition, defense counsel performed the demonstration that I had authorized. He donned the shoe, tucked the (disabled) gun into the shoe, and walked about the well of the courtroom in an attempt to demonstrate that it was impossible for his client to have carried the gun in that manner, or to have done so without its having been apparent. (Tr. 977:2–980:17) I instructed the jury that this was not scientific evidence, but rather a demonstration—a form of visual argument or persuasion. (Tr. 977:24–978:5)

### 2. Analysis

The Court's ruling regarding the recall of Sgt. Fernandez was essentially based on a balancing analysis under Federal Rule of Evidence 403:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

The limited probative value of recalling Fernandez to insert the gun in the shoe, I find, was substantially outweighed by the other Rule 403 factors.

First, Fernandez admittedly did not see the gun until after it had been partially removed, when Petway was kicking off his shoes. If recalled, then, Fernandez could not add anything to his prior testimony regarding the precise location of the gun when Petway was carrying it. The defense thoroughly cross-examined Fernandez, using the gun as a prop, and exhausted Fernandez's limited knowledge and recollection as to the gun's position in the shoe.

 Second, for the same reason, Fernandez was not a percipient witness as to the specific issue. It follows that having him insert the gun in the shoe was no more probative than having counsel, or the jurors themselves, do so.

17

Third, as I found at the time, lay jurors were well equipped to judge the issue for themselves, based on their inspection of the gun and the pants. My own judgment, expressed to counsel during argument, was that the "impossibility" issue was not a substantial one; the shoes were large, extending well above the ankle, and the pants were stretchy and zippered at the bottom.

Fourth, such a demonstration by Fernandez (or anyone) was not shown to be an accurate reconstruction of conditions at the time of the arrest.

Fifth, I permitted defense counsel to perform a demonstration equivalent to the one requested. In summation, counsel donned the shoe, inserted the barrel of the gun, and attempted to demonstrate the impossibility or unlikelihood that the defendant would have concealed the gun in that manner. My instruction to the jury—essentially, that this was offered for demonstrative purposes, and not as a reconstruction of what had (not) occurred on the street corner—gave the defense ample latitude to make its argument without misleading the jury.

For all of these reasons, the recall of Fernandez to insert the gun in the shoe was of limited probative value, and also flunked the 403 tests of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

## ORDER

For the reasons set forth above,

**IT IS** this 8th day of August, 2022,

**ORDERED** that the defendant's motions for a judgment of acquittal or for a new trial, pursuant to Fed. R. Crim. P. 29 and 33 (DE 81, 82) are **DENIED**.

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

18